IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KRISTINE VALDEZ, a.k.a. Kristine
Sauceda, on her own behalf and on behalf of
Dezideria Sauceda and Santiago Sauceda; and
PAULA GENTHNER, on her own behalf and
on behalf of Megan Genthner and Zachary
Genthner, individually; and on behalf of all
similarly situated persons,

        Plaintiffs,

vs.                                      No. CIV 05-451 MV/ACT

NEW MEXICO HUMAN SERVICES
DEPARTMENT, *et al*.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion to Dismiss and/or

Motion for Summary Judgment as to All Claims Against All Defendants, filed on July 17, 2006,

**[Doc. No. 167]**.  The Court, having considered the motion, briefs, relevant law and being

otherwise fully informed, finds that the motion will be **GRANTED**.

## BACKGROUND

The instant lawsuit is brought pursuant to 28 U.S.C. § 1983 by a proposed class of New

Mexico Medicaid recipients who contend that Defendant New Mexico Human Services

Department's ("HSD") recertification system for certain Medicaid benefits[1] violates the Medicaid

Act, their procedural due process rights under the Fourteenth Amendment of the United States

_____

[1]  The three Medicaid categories at issue in this case are (1) pregnancy and family planning
Medicaid; (2) Medicaid for children under 19; and (3) Medicaid for families.

Constitution, as well as the New Mexico Constitution and state regulations because it permits automatic computer termination of benefits at the end of the designated eligibility period without proper notices and without an individualized review to affirmatively determine if a recipient continues to qualify for Medicaid.  Plaintiffs also contend that Medicaid benefits are being automatically terminated by HSD's computer system even though recipients timely submit recertification materials because HSD caseworkers fail to enter the requisite information to recertify recipients' eligibility prior to the expiration of their Medicaid authorization.

## I.  The Medicaid Program

The Medicaid program, established by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is a cooperative federal-state program created to provide medical assistance to needy families and individuals.  States are not required to participate in the Medicaid program, but once a state elects to participate, it must do so in accordance with federal statutes and regulations. 42 U.S.C. § 1396a(a)(10).  New Mexico has elected to participate in the Medicaid program and HSD is the state agency responsible for providing medical assistance to eligible individuals consistent with the federal Medicaid program.

Under the Medicaid Act, a state is required to

* * *

(3) provide for granting an opportunity for a fair hearing before the [HSD] to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness;

* * *

(8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals;

42 U.S.C. §§ 1396a(a)(3) & (8).[2]

Federal regulations implementing the Medicaid Act require that a state "redetermine the eligibility of Medicaid recipients, with respect to circumstances that may change, at least every 12 months" and "have procedures designed to ensure that recipients make timely and accurate reports of any change in circumstances that may affect their eligibility."[3]  42 C.F.R. § 435.916.  A state must "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible."  42 C.F.R. §  435.930(b).

When making redeterminations of Medicaid eligibility, a state "must give recipients timely and adequate notice of proposed action to terminate, discontinue, or suspend their eligibility or to reduce or discontinue services they may receive under Medicaid."  42 C.F.R. § 435.919 (a).  To be adequate, a notice of adverse action must contain: 1) a statement of the action the state plans to take; 2) the reason for the intended action; 3) the specific regulations that support the action; 4) an explanation of the individual's right to request a fair hearing; and 5) an explanation that the individual might be entitled to continued benefits if he/she requests a hearing within thirteen days of the date of the notice.  *See* 42 C.F.R. §§ 431.210(a)-(e).  To be timely, a notice must be mailed at least ten days prior to the proposed action.  *Id*. at § 431.211.

---

[2]  The Court previously held that Plaintiffs have enforceable rights of action under 42 U.S.C. § 1396a(a)(3) & (8).  *See* Memorandum Opinion and Order, March 14, 2006, [Doc. No. 104].

[3]  State regulations implementing the Medicaid program in New Mexico further require that the "burden of proving eligibility for medicaid is on the applicant/recipient.  An individual has the primary responsibility for providing required information and documents and for taking the action necessary to establish eligibility . . . An applicant/recipient's failure to provide documentation or to take required action results in a decision that eligibility does not exist."  N.M. Admin. Code tit. 8,  § 200.430.9(C)(1) (2006).

II.      New Mexico's Recertification Process

Prior to May 2004, persons in New Mexico receiving one of the categories of Medicaid benefits at issue in this case continued to receive benefits until an HSD caseworker determined that a recertification had not been completed and manually closed the case on the computer system.  HSD caseworkers apparently did not make recertifying benefits a priority, which resulted in numerous cases staying open past the eligibility period.[4]  From January 2003 to January 2004, at least 10,000 recipients continued to receive Medicaid past the expiration of their certification periods.  After a federal audit, HSD had to reimburse the Medicaid program for the benefits paid to persons who were ineligible.[5]

In an attempt to meet federally mandated deadlines for recertifying eligibility (and lessen the risk of additional recoupments of payments to ineligible persons), HSD implemented several changes to the way it administered the Medicaid program, including how it handled the required periodic determinations of the continuing eligibility of certain categories of persons receiving health coverage under Medicaid.  Specifically, HSD required that redeterminations of eligibility be made every six months, rather than every twelve months, for certain categories of Medicaid

---

[4]  *See* Dep. of Rita Espinosa at 66-67 (Q.  Did the automatic closure system affect your caseworkers' workloads?  A.  No.  Q.  Did it affect the way they did their jobs in any way?  A. Somewhat.  It encouraged them to do their jobs properly.  Q.  Explain why.  A.  Well, because they couldn't choose not to do a recertification because then somebody's Medicaid was at stake, whereas before they could overlook it, you know, not do it.  They were supposed to do the recertifications.  So you know, the proper way was to do the recertifications because we have to know if somebody continues to be eligible.  Otherwise, that can cause all kinds of problems.  But some caseworkers just let the cases go on without determining the eligibility, and this forced them to do it.).

[5]  It is unclear from the record if any of the financially ineligible families remaining on Medicaid for which HSD had to reimburse the Medicaid program were enrolled in the three categories of Medicaid at issue in this case.

recipients whose eligibility is based on income and that these Medicaid cases be closed if the information required for recertification was not received and updated in the computer system by the required recertification date.[6]  To effectuate these changes, HSD reprogrammed its computer system to automatically close a case if the information required for recertification was not input by the end of the current eligibility period.

Under the revised recertification system, once an individual is initially determined to be eligible for Medicaid, HSD sends them a notice of approval stating the period of eligibility and informing the individual of the need to reapply prior to the expiration of their benefits. Approximately 45 days before the period of eligibility is set to expire, HSD sends a Notice of Expiration advising individuals of the need to recertify their eligibility for Medicaid benefits.  The Notice of Expiration informs recipients that their benefits will continue without delay if they submit a signed reapplication as well as proof of income and health insurance by the first day of the expiration month of their current certification period.  The Notice of Expiration also informs recipients that if they do not provide this information, their benefits will end.

If, in response to the Notice of Expiration, an incomplete application is received, a letter is sent out telling the recipient what is still needed in order to make a determination on the application.  If a complete recertification application is not received, and input into the system, by the first day of the last month of the eligibility period, the system generates a Notice of Closure stating that the required recertification information was not received and that benefits will expire at the end of the month.  The Notice of Closure also informs the recipient of his or her appeal

---

[6]  Beginning July 1, 2006, HSD returned to a policy of requiring recertification of eligibility every twelve months rather than every six months for pregnancy and family planning Medicaid and Medicaid for families.

rights, including the right to an individualized fair hearing regarding the proposed termination and that Medicaid benefits will be continued during the pendency of an appeal.  If recertification materials demonstrating continuing eligibility for Medicaid benefits are received late--after the first of the month but prior to the date benefits expire, HSD caseworkers attempt to get the information processed so that benefits do not expire but there may be a lapse in benefits.

Following implementation of the automatic closure policy, the number of Medicaid cases closed each month increased significantly.[7]  The majority of the closed cases are reopened a few months later.  Plaintiffs contend that the number of closed cases increased after implementation of the automatic closure policy because HSD caseworkers could not process all of the recertifications in a timely manner due to their high caseloads.  Defendants, on the other hand, maintain that the increase in closed cases is attributable to Medicaid recipients not timely submitting recertification information.

## III.  Plaintiff Kristine Valdez

For the past five years, Plaintiff Kristine Valdez (a.k.a. Kristine Sauceda) has received Medicaid benefits for her two children--twelve-year-old  Dezideria Sauceda and eight-year-old Santiago Sauceda.  On or about January 8, 2005, Plaintiff Valdez received a computer-generated notice from HSD's Income Support Division stating that her children's current eligibility period for Medicaid benefits ended on February 28, 2005, and providing information on the process for

---

[7]  In April 2004, the month before HSD's computer was reprogrammed to automatically close cases, HSD caseworkers manually closed 3,138 cases because clients failed to complete the recertification process.  In May 2004, the first month HSD's computer began automatically closing cases, 5,245 cases were closed because recipients failed to complete the recertification process.  *See* Aff. of Ellen Pinnes, attached to Plaintiffs' Motion for Preliminary Injunction as Ex. B.

recertifying eligibility for Medicaid benefits.  The notice further advised Plaintiff Valdez that she would need to complete the recertification application by February 1, 2005, if she wanted to continue to receive benefits "without delay."  In response to the notice, Plaintiff Valdez completed and faxed a recertification application, a copy of her expiration notice, and five pages of income documentation on or about January 25, 2005.  Due to a clerical error in intake, Plaintiff Valdez's recertification materials were not logged in and were not distributed to her caseworker.

On or about February 19, 2005, Plaintiff Valdez received a computer-generated "Notice of Closure" from HSD advising her that her case had been closed because she "[f]ailed to reapply for benefits" and informing her of her appeal rights and right to request a hearing on this determination.  Plaintiff Valdez left several messages for her caseworker but received no response.

Rather than request a fairness hearing, Plaintiff Valdez filed this lawsuit.  Approximately three days after the lawsuit was filed, which was the first notice HSD had that Plaintiff Valdez's recertification materials had been misplaced, HSD restored Plaintiff Valdez's children's Medicaid benefits retroactively.  Since this time, Plaintiff Valdez has recertified her Medicaid benefits twice without incident.

## IV.  Plaintiff Paula Genthner

Plaintiff Paula Genthner has received Medicaid benefits for her two children--seventeen-year-old  Megan Genthner and seven-year-old Zachary Genthner--since they were born.  Plaintiff Genthner has also been receiving Family Planning Medicaid for herself for approximately eight years.  On or about April 8, 2005, HSD sent Plaintiff Genthner a Notice of Expiration notifying her that her Children's Medicaid benefits would be ending on May 31, 2005, and stating that she

needed to provide certain information by the first of the month in order for her children to continue to receive benefits without delay.  Due to a change in address, that Plaintiff Genthner had reported to HSD but HSD had not updated in its system, Plaintiff Genthner did not receive this notice until about May 15, 2005.  Plaintiff Genthner promptly completed and turned in recertifications for her children's Medicaid.  On or about May 22, 2005, Plaintiff Genthner received a Notice of Closure notifying her that her children's Medicaid benefits were being terminated because she had "failed to reapply for benefits."   The Notice of Closure informed Plaintiff Genthner of her right to appeal the determination but did not advise her of the specific manual section upon which HSD relied in making this decision.

Plaintiff Genthner's children's Medicaid cases were subsequently closed.  On June 1, 2005, after several attempts, Plaintiff Genthner was able to reach her caseworker, who informed her that he had not received her recertification and requested that she submit a new recertification.  Plaintiff Genthner submitted a new recertification that day.  On or about June 3, 2005, Plaintiff Genthner also received a Notice of Closure for her Family Planning Medicaid because she had failed to reapply for benefits.  That same day, Plaintiff Genthner's Family Planning and her children's Medicaid cases were reinstated retroactively.

Due to the break in Medicaid benefits, Medicaid initially refused to pay for medical services Plaintiff Genthner's son received the first part of June, 2005.  To resolve this issue, Plaintiff Genthner requested a fairness hearing.  On June 9, 2005, Plaintiff Genthner received a notice from the Fair Hearing Division acknowledging that it had received her request for a hearing.  The notice indicated that Plaintiff Genthner's caseworker was to submit a Summary of

Evidence explaining the reason for his actions by June 13, 2005.[8]  A summary of evidence, dated June 20, 2005, was provided to Plaintiff Genthner on July 28, 2005.  A fairness hearing was held on August 3, 2005, and, as a result of this hearing, Plaintiff Genthner's son's medical bills were ultimately paid by Medicaid.

Since Plaintiff Genthner's benefits were reinstated, she has reapplied for Medicaid benefits twice and been approved without incident.

On June 12, 2006, Plaintiffs Valdez and Genthner filed a Complaint, on behalf of themselves and similarly situated persons, alleging that HSD's recertification system violates provisions of the Medicaid Act, the due process clause of the United States Constitution, the due process clause and the inherent rights clause of the New Mexico State Constitution, and state regulations.  As relief, Plaintiffs seek a declaration that the recertification system[9] violates provisions of the Medicaid Act, the due process clause of the United States Constitution, the due process clause and the inherent rights clause of the New Mexico State Constitution, and state regulations and an injunction prohibiting HSD from operating the recertification system.

## LEGAL STANDARD

Defendants' motion, which asserts both failure to state a claim and lack of subject matter jurisdiction, is brought as a motion to dismiss and/or a motion for summary judgment.  "[A] court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56

---

[8]  HSD regulations require that a caseworker submit a Summary of Evidence within seven days of the request for a hearing.  *See* N.M. Admin. Code tit. 8,  § 100.970.10(F) (2006).

[9]  Plaintiffs refer to the recertification system as the "automatic closure system."  As it is clear, however, that Plaintiffs are challenging more than simply the automatic closure feature of HSD's recertification process, the Court will refer to their challenge as one to the entire recertification process and not simply the automatic closure feature.

summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).   "[The underlying issue [in determining whether the jurisdictional question is intertwined with the merits] is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Cringle v. United States*, 208 F.3d 1220, 1223 (10th Cir. 2000).

The jurisdictional issue here is whether Plaintiffs have standing to seek declaratory and injunctive relief.  To resolve that issue, the Court must answer three questions: (1) whether Plaintiffs are suffering a continuing injury or are under a real and immediate threat of being injured in the future; (2) whether there is a causal connection between the injury and the Medicaid recertification system; and 3) whether the alleged injury will be redressed by a favorable decision by the Court.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).  In order to determine if Plaintiffs are suffering a continuing injury or are under a real and immediate threat of being injured in the future, the Court must determine the legality of HSD's recertification system. Thus, it is apparent that the resolution of the jurisdictional question is intertwined with the merits of the case and Defendants' motion to dismiss will be converted to a Rule 56 summary judgment motion.  *See also Wheeler v. Hurdman*, 825 F.2d 257, 260 (10th Cir. 1987) (motion asserting both lack of subject matter jurisdiction and failure to state a claim properly considered as a motion in the alternative under 12(b)(1) and 12(b)(6) and converted to a Rule 56 motion when extraneous evidence was submitted in the form of affidavits by both parties).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c); *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).  Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  There is no requirement that the moving party negate the nonmovant's claim. *See Celotex Corp. v. Catrett*,  477 U.S. 317, 325 (1986).  Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citations omitted).  Rather than "merely show there is some metaphysical doubt as to the material facts," the nonmoving party is required to "go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).  There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson*, 477 U.S. at 248.   Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus*, 985 F. Supp at 1281.

### DISCUSSION

Defendants seek summary judgment on all claims on the grounds that Plaintiffs lack standing for the type of declaratory and injunctive relief that they seek and that Plaintiffs have failed to state a claim upon which relief can be granted.[10]  Because the question of standing goes to the Court's jurisdiction over this case, it will be considered first.  *See Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 1012-13, 140 L.Ed.2d 210 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception.") (internal quotes omitted).

As courts of limited subject matter jurisdiction, federal courts may only rule upon "cases" and "controversies."  U.S. Const. art. III, § 2.  "[The core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).  Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

The "irreducible constitutional minimum" of Article III's case-or-controversy requirement contains three elements.  *Lujan*, 504 U.S. at 560; *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996).  First, the plaintiff must have suffered an "injury in fact" that is "concrete" rather than "conjectural or hypothetical."  *Lujan*, 504 U.S. at 560.  Second, the plaintiff must show that there is a "causal connection between the injury and the conduct

---

[10]  Defendants' motion also addresses the viability of a substantive due process claim. Plaintiffs have clarified, however, that they are not asserting a substantive due process claim.

complained of." *Id.*  Finally, the plaintiff must show that it is "likely," and not merely

"speculative," that the injury complained of will be "redressed by a favorable decision." *Id.* at 561.

The "injury in fact" requirement is satisfied differently depending on whether the plaintiff

seeks prospective or retrospective relief.  *See City of Los Angeles v. Lyons*, 461 U.S. at 101-02,

105; *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991) ( "standing to obtain injunctive and

declaratory relief must be analyzed separately from standing to obtain retrospective relief")

(internal quotes omitted).  When seeking prospective relief, a plaintiff must be suffering a

continuing injury or be under a real and immediate threat of being injured in the future. *City of*

*Los Angeles v. Lyons*. 461 U.S. at 101-02, 107 n. 8.  The threatened injury must be "certainly

impending" and not merely speculative.  *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528

U.S. 167, 190, 120 S.Ct. 693 (2000) (quotation omitted); *O'Shea v. Littleton*, 414 U.S. 488, 494,

94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (to establish standing, "[i]t must be alleged that the plaintiff

'has sustained or is immediately in danger of sustaining some direct injury' as the result of the

challenged statute or official conduct. The injury or threat of injury must be both 'real and

immediate,' not 'conjectural' or 'hypothetical.'")(internal cite omitted).  The fact of past injury

does not confer standing to seek prospective injunctive relief without some credible threat of

future injury. *Id.* at 495-96 ("Past exposure to illegal conduct does not in itself show a present

case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present

adverse effects."); *Facio*, 929 F.2d at 544 (noting that the Supreme Court has held that, "while a

plaintiff who has been constitutionally injured can bring a § 1983 action to recover damages, that

same plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate

a good chance of being likewise injured in the future").

Standing is determined as of the time the action is brought. *See Smith v. Sperling*, 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957) (jurisdiction is tested by the facts as they existed when the action is brought); *Laidlaw Envtl. Servs.*, 528 U.S. at 180 ("[W]e have an obligation to assure ourselves that [plaintiff] had Article III standing at the outset of the litigation."); *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003) ( "Article III standing must be determined as of the time at which the plaintiff's complaint is filed."); *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint."). The party seeking to invoke federal jurisdiction bears the burden of establishing all three elements of standing. *Lujan,* 504 U.S. at 561. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id*. Thus, when standing is raised at the summary judgment stage, the plaintiff must set forth by affidavit or other evidence specific facts that, if taken as true, establish each of these elements. *Id*.

It is undisputed that Plaintiffs' initial injuries--the temporary termination of their benefits and the receipt of a notice without a required citation--have been corrected by reinstatement of their benefits and correction of the notice to include the proper citation. Consequently, in order to establish standing, Plaintiffs must show that as of the date their complaint was filed, they faced a real and immediate threat of being injured in the future by the recertification process and that such injury will be redressed by a favorable judicial order.

While Plaintiffs' precise claims are difficult to discern, it appears that the essence of Plaintiffs' claims is that the recertification process, both on its face and in practice, violates the Medicaid Act and procedural due process.[11]  Thus, the real and immediate threat of future injury, as defined by Plaintiffs, is that every time they are required to recertify their eligibility under HSD's recertification process they are subject to HSD's illegal policies and exposed to the risk that their health coverage will be improperly terminated.

## I.  Facial Validity of Recertification Process

### A.  Eligibility Period

HSD is required, under federal law, to provide Medicaid "with reasonable promptness to all eligible individuals" and to "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible."  42 U.S.C. § 1395a(a)(8) & 42 C.F.R. § 435.930(b). Plaintiffs argue that these provisions establish open-ended eligibility that requires HSD to perform a factual inquiry to establish that an individual is no longer eligible for Medicaid prior to terminating benefits.  Consequently, according to Plaintiffs, any system that automatically terminates cases based on a recipient's failure to submit recertification materials violates the

---

[11]  Plaintiffs, without approval of the Court or authorization under local rule, purported to incorporate by reference all prior briefing submitted by Plaintiffs in this case in their response to the instant motion.  *See* Response at p. 2, n. 1 ("For most of the authorities in support of their positions in this brief, plaintiffs rely on prior briefing that is incorporated herein by reference . . .").  While in certain circumstances it may be appropriate to incorporate by reference a specific section or argument in a prior brief, it is not appropriate to incorporate by reference an entire prior brief, much less *all* prior briefs.  The Court was initially inclined to disregard this unauthorized incorporation but it found, upon reviewing Plaintiffs' response, that resort to other briefing was necessary to discern the nature of Plaintiffs' claims.  Consequently, this Opinion refers to, and relies upon, the prior briefing submitted by both parties in this case on Plaintiffs' Motion for Preliminary Injunction, Plaintiffs' Motion for Class Certification, and Defendants' Motion to Dismiss All Claims Against All Defendants.  Plaintiffs, however, should not expect such lenient treatment in the future.

Medicaid Act.  HSD, considering these two provisions in conjunction with 42 C.F.R. § 435.916, which requires HSD to recertify the eligibility of recipients at least every twelve months, contends that Medicaid establishes a close-ended period of eligibility that expires at the end of the predetermined time unless information is submitted demonstrating that a recipient remains eligible. Therefore, according to HSD, submission of timely and complete recertification information is a condition precedent to a determination of eligibility and, in the absence of such information, HSD has no basis upon which to make the federally-mandated redetermination of eligibility and must consider a recipient ineligible.

Neither party offers any evidence other than the language of the statute and regulations to support their respective positions.  The two federal courts that have considered challenges to Medicaid recertification processes that automatically terminate benefits at the end of the eligibility period if recertification information is not provided (or timely entered into the computer system) have either explicitly found or assumed that eligibility for benefits is not open-ended but expires at the end of the eligibility period.[12]  In *Salazar v. D.C.*, 954 F.Supp. 278 (D.D.C. 1996), plaintiffs asserted that the District of Columbia improperly permitted Medicaid benefits to lapse by failing to timely process recertifications.  In its findings of fact, the court found that "[the period of Medicaid eligibility is generally one year.  At the end of the applicable period, each recipient must be recertified in order to maintain her eligibility."  *Id*. at 292; *see also id*. at 327 (stating that defendants "allowed many Medicaid recipients' benefits to lapse by failing to process

---

[12]   At least one state court has upheld a state's interpretation of this regulation as establishing a close-ended period of eligibility.  *See Fryeburg Health Care Center v. Department of Human Services*, 734 A.2d 1141 (Me 1999) (upholding state's interpretation that timely eligibility reassessments must be performed for a recipient's eligibility to continue).

recertifications submitted by recipients *whose eligibility was due to expire that month*") (emphasis added).

Similarly, in *Graus v. Kaladjian*, 2 F.Supp.2d 540 (S.D.N.Y. 1998), Medicaid recipients asserted that New York City's Medicaid recertification system violated federal law because it "permit[ted] automatic computer termination of benefits at the end of the authorized period without sufficient opportunity for recertification prior to termination." *Id*. at 542. In its opinion, the court stated that "plaintiffs allege that in numerous cases the City defendant fails to act with sufficient expedition to recertify Medicaid recipients' eligibility *prior to the annual expiration of their Medicaid authorization*." *Id*. at 541 (emphasis added).

In addition to this limited support from the caselaw, the plain language of the Medicaid provisions supports HSD's determination that there is a discrete period of eligibility. The Medicaid regulations require HSD to provide benefits until a determination of ineligibility is made and to recertify eligibility at least every twelve months. These provisions, read together, support HSD's determination that there is a discrete period of eligibility of no more than twelve months and that a recipient is ineligible for Medicaid at the end of that period if information is not submitted establishing continuing eligibility. Consequently, a recertification system that automatically terminates the benefits of recipients who have not submitted the required information to demonstrate continuing eligibility by the end of their current eligibility period does not, on its face, violate the Medicaid Aid and applicable regulations.

B. *Ex Parte* Review

In a related but conceptually distinct argument, Plaintiffs contend that the Medicaid Act requires an *ex parte* review of a recipient's file to determine if the recipient is factually eligible

prior to termination of benefits.  According to Plaintiffs, "[s]tates may not terminate health care coverage until they independently determine that the particular person's continuing eligibility has ceased, and this determination must be made even if there is no direct participation by the covered individual."  Memorandum Brief in Support of Plaintiffs' Motion for Preliminary Injunction, [Doc. No. 64], at p. 12.  In support of this assertion, Plaintiffs cite cases holding that persons who automatically qualify for Medicaid because they are also receiving other federal aid, such as Supplemental Security Income ("SSI"), may not be automatically terminated from Medicaid when these other federal benefits are terminated.[13]  These cases are clearly distinguishable from the instant case.

Under the Medicaid Act, a state must provide assistance to the "categorically needy," and may choose to provide assistance to the "medically needy."  Categorically needy individuals are those receiving federal assistance through other programs such as Aid to Families with Dependent Children or SSI.  In the line of cases relied upon by Plaintiffs, states were automatically terminating recipients from Medicaid upon notification that SSI or other program benefits had been discontinued so that they no longer qualified as categorically needy.  The courts hearing these cases held that prior to terminating recipients who no longer qualified as categorically needy the state must make a prompt *ex parte* determination whether these persons qualified as "medically needy."  The courts in these cases reasoned that the fact that a recipient is no longer automatically eligible does not mean that the recipient is automatically ineligible for  benefits.  Thus, termination of benefits based on the fact that a recipient is no longer automatically eligible

---

[13] Plaintiffs rely upon *Crippen v. Kheder*, 741 F.2d 102 (6th Cir. 1984); *Gilman v. N.H. Dept. of H.H.S.*, 606 F.Supp. 644 (D.N.H. 1985); *Rousseau and McKenna v. R.I. Human Services Dept.*, 624 F.Supp. 355 (D.R.I. 1983).

violates Medicaid's requirement that a recipient receive benefits until a determination of ineligibility has been made.

The situation where a recipient is terminated for no longer being automatically eligible, without a determination that the recipient is ineligible, is entirely different from the situation where a recipient is terminated from a program for failure to establish continuing eligibility for that program.  In the latter case, the state has made a determination of ineligibility based on a recipient's failure to demonstrate continuing eligibility.

Other than these inapposite cases, Plaintiffs provide no authority for the proposition that Congress intended to preclude a state agency from closing a case for failure to provide the required eligibility information without first conducting an *ex parte* review of the recipient's file.[14] Absent any evidence that Congress intended to require that a state conduct an *ex parte* review on the thousands of cases that are up for recertification each month, the Court will not impose such a burdensome requirement.

Further, it is unclear from the record what such an *ex parte* review would accomplish in the context of Medicaid recertifications.  Medicaid recipients in the categories at issue are required to provide updated income information at least every twelve months.  There is no evidence that an *ex parte* review of a recipient's file would provide this updated information.  Nor is it apparent that such a review would prevent the errors that resulted in the temporary loss of Plaintiffs' benefits--*i.e.* reveal that a recertification application was filed but misplaced or that a change of address had not been processed.

---

[14] In fact, Congress has explicitly required state plans to provide *ex parte* reviews in some cases.  42 U.S.C. §§ 1396a(e)(10)(B) & 1396r-6(b)(3).

As a matter of law, the Court is not convinced that the Medicaid Act or its implementing regulations require that an *ex parte* review take place prior to termination of Medicaid benefits for failure to submit recertification documents.[15][16]

C.   Due Process

Plaintiffs also challenge the sufficiency of the process provided by HSD's recertification process.   A procedural due process claim involves a two-part inquiry: whether the plaintiff was deprived of a protected interest and, if so, what process was due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).   It is undisputed that Plaintiffs have a protected interest in the receipt of Medicaid benefits.   *See O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 787 (1980) (direct Medicaid benefits are a protected property interest that cannot be withdrawn without giving the recipient notice and an opportunity to be heard).   It is also undisputed that Plaintiffs were temporarily deprived of this interest when their Medicaid benefits were terminated. The only remaining question is whether Plaintiffs were deprived of this protected interest without

---

[15]   In their motion for preliminary injunction, Plaintiffs assert that the "centers for Medicaid and Medicare Services (CMS), the agency within the Health and Human Services Department (HHSD) responsible for oversight of the Medicaid program, has interpreted 42 C.F.R. § 435.930(b) and 42 U.S.C. § 1396(a)(8), upon which it is premised, to require that states independently determine each person's eligibility on an *ex parte* basis prior to the termination of health care coverage."   Memorandum Brief in Support of Plaintiffs' Motion for Preliminary Injunction, [Doc. No.  64], at p. 11.   Plaintiffs, however, provide no support for this assertion.

[16]   Plaintiffs state that in *Salazar v. District of Columbia*, 954 F. Supp. at 327, the "court struck down identical auto-closure system, holding that the District of Columbia Human Services Department violated health care coverage recipients' due process rights by automatically closing their cases via computer prior to an *ex parte* review."   Memorandum Brief in Support of Plaintiffs' Motion for Preliminary Injunction, [Doc. No.  64], at p. 16.   Plaintiffs misstate the holding in *Salazar*.   The *Salazar* court held that allowing a significant percentage of Medicaid recipients' benefits to lapse due to the District's failure to timely process recertifications violated 42  C.F.R. § 435.930(b).   The *Salazar* court did not even discuss the issue of an *ex parte* review, much less hold that such a review is required by due process.

appropriate process.  To answer this question, the Court must first determine what process was due.

Under Medicaid regulations, HSD is required to "give [Medicaid] recipients timely and adequate notice of proposed action to terminate, discontinue, or suspend their eligibility" and to provide an opportunity for a hearing if it takes such action. 42 C.F.R. § 435.919(a) and § 431.200 (1995).  To be timely, the notice must be mailed at least 10 days before the date of termination or suspension of eligibility.  42 C.F.R. § 431.211.  To be adequate, the notice  must contain "(a) [a] statement of what action [HSD] intends to take, (b) [the reasons for the intended action, and (c) [the specific regulations that support . . . the action." *Id*. § 431.210.  The hearing procedures must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970).  *Id*. at § 431.205(d).

Notice and an opportunity for a hearing prior to termination of Medicaid benefits are also required by the Due Process Clause of the Fifth Amendment.  *See Goldberg v. Kelly*, 397 U.S. 254, 265-67, 90 S.Ct. 1011, 1019-20, 25 L.Ed.2d 287 (1970) (holding that notice and evidentiary hearing are required before state may terminate welfare benefits); *Ortiz v. Eichler*, 794 F.2d 889, 893-94 (3d Cir. 1986) (applying *Goldberg*'s notice requirement to terminations of Medicaid benefits).

To establish standing for their due process claim, Plaintiffs must show a real and immediate threat of benefits being terminated in the future without adequate notice and an opportunity for a fair hearing.  Plaintiffs do not allege that they were denied the opportunity to have a hearing to redress any determinations made regarding their eligibility or that the hearing

process was inadequate to redress the erroneous terminations of their Medicaid benefits. Plaintiffs, however, do challenge the adequacy of HSD's adverse action notice.

Plaintiffs' initially asserted that HSD's adverse action notice failed to include a reference to the New Mexico Administrative code.  HSD corrected the notice immediately after this lawsuit was instituted and there is no evidence that Plaintiffs will receive a similarly defective notice in the future.

In their response, Plaintiffs admit that HSD's adverse action notices satisfy Medicaid requirements.  *See* Plaintiffs' Response to Defendants' Motion to Dismiss and/or Motion for Summary Judgment ("Response") at p. 9 ("it is correct that defendants' notices of adverse actions contain a statement of the intended action, the reason for the action, the specific regulation, an explanation of the individual's right to request a fair hearing and an explanation of the circumstances under which Medicaid is continued if a hearing is requested.").  Plaintiffs assert, however, that the notices are "illegal on their face because they treat Medicaid recipients as applicants and inform them that they have 'failed to reapply for benefits' even when recipients have properly recertified."  *Id*. at 21.  Even if this argument were properly raised, it is not persuasive.  First, whether HSD refers in their notice to the process of providing updated information as "reapplying" or "recertifying" is a matter of semantics that does not rise to the level of a procedural due process violation.  *See Reynolds v. Sheldon*, 404 F.Supp. 1004, 1010 (N.D. Tex. 1975) (noting that "[d]ue process considerations are not normally reduced to quibbling over semantics.").  Second, the fact that an occasional recipient receives a notice stating that they failed to reapply when a reapplication in fact was submitted does not make the notice itself deficient.

Plaintiffs have failed to show a real and immediate threat of their Medicaid benefits being terminated in the future without adequate notice and an opportunity for a fair hearing. As a result, Plaintiffs do not have standing to bring a due process challenge to HSD's recertification process.

D. Prompt Decision

In their Complaint, Plaintiffs also assert that HSD fails to take prompt action on Medicaid cases in violation of 42 U.S.C. § 1395a(a)(8). *See* 42 U.S.C. § 1395a(a)(8) (state must provide Medicaid "with reasonable promptness to all eligible individuals"). Plaintiffs have failed to present any argument in support of their prompt action claim and could be considered to have abandoned this claim. *See, e.g., United States v. Fisher,* 38 F.3d 1144, 1147 (10th Cir. 1994) (court is not required to fashion plaintiff's arguments for her where her allegations are merely conclusory in nature and without supporting factual averments). However, to the extent the Court can discern the basis for Plaintiffs' claim, the Court will attempt to address it on the merits.

HSD's recertification process, with its automatic closure feature, is designed to promptly close cases if recertification information is not received and timely input into the system. In fact, Plaintiffs have acknowledged that prompt decisions are made. *See* Response at p. 6, n.4 ("Clearly, with an automatic closure system in place, defendants' closures of Medicaid cases will be prompt."). Assumably, Plaintiffs' position is that a recertification process that results in a significant number of prompt, but erroneous, decisions violates Medicaid's requirement that benefits be "provided with reasonable promptness to all eligible individuals." The Court need not reach this issue, however, because, as discussed below, Plaintiffs have failed to come forward

-23-

with evidence establishing any systemic problems in the processing of recertifications such that a

significant number of erroneous closures are being made.

Furthermore, it is undisputed that both Plaintiffs received a prompt determination on their

Medicaid applications.  Due to human error in the intake process, both Plaintiffs received an

erroneous, determinations that they were not eligible for Medicaid benefits because they had not

timely submitted recertification materials.  Even assuming that isolated prompt, but erroneous,

decisions could violate Medicaid's promptness provision, which appears unlikely, Plaintiffs' claim

still fails. Out of the thousands of Medicaid recertifications processed each month, Plaintiffs have

come forward with evidence of only two cases in which a recertification was misplaced by HSD.

Based on these facts, the Court cannot find that Plaintiffs have demonstrated a real and immediate

threat of suffering a similar injury in the future as required to establish standing to seek

prospective relief.  An occasional human error is unavoidable in administration of a large program

like Medicaid.  These are the types of errors the hearing process is designed to correct.  *See, e.g.,*

*Soskin v. Reinertson*, 353 F.3d 1242, 1261-1262 (10th Cir. 2004) (errors in Medicaid

redetermination process can be exposed at hearing).

On its face, HSD's recertification system is consistent with the requirements of the

Medicaid Act and provides recipients with appropriate process. Consequently, Plaintiffs are not at

risk of future injury simply because the recertification system is in place.  Plaintiffs' case,

therefore, turns on whether there are serious systemic failures in the operation of the

recertification system that effectively violate the Medicaid Act or deprive recipients of their

constitutionally guaranteed rights to notice and an opportunity to be heard.

## II.  As Applied Challenge to Recertification Process

Plaintiffs make two challenges to the recertification process in practice:  1) that

recertifications are not being timely processed by caseworkers and 2) that the notices are

untimely.  At least one other court has held that a systemic failure to timely process

recertifications violates a state's obligation to "furnish Medicaid regularly to all eligible individuals

until they are found to be ineligible."  *See, e.g., Salazar v. District of Columbia*, 954 F. Supp. at

327 (holding that allowing a significant percentage of Medicaid recipients' benefits to lapse due to

District's failure to timely process recertifications violated 42 C.F.R. § 435.930(b)).

Plaintiffs have submitted undisputed evidence demonstrating that the number of Medicaid cases

closed each month has increased significantly since implementation of the new recertification

process.  Plaintiffs' claim falters, however, on establishing that this increase in closed cases is due

to recertifications not being timely processed.  In support of their claim that recertifications are

not being timely processed, Plaintiffs have come forward with evidence that HSD caseworkers

have higher caseloads than caseworkers in neighboring states; that caseworkers' jobs are

challenging and stressful; that occasional mistakes occur in the recertification process; that some

HSD offices are not as well run as others; that prior to the automatic closure policy there was a

backlog of recertifications;[17] that the shorter recertification process increased workloads; that no

---

[17]  Rita Espinosa, Income Support Division's Regional Operations Manager for Bernalillo
County, explained that this backlog of cases was the result of HSD caseworkers not making
recertifications a priority under the old recertification system:

    Q.  Did the automatic closure system affect your caseworkers' workloads?
    A.  No.
    Q.  Did it affect the way they did their jobs in any way?
    A.  Somewhat.  It encouraged them to do their jobs properly.
    Q.  Explain why.
    A.  Well, because they couldn't choose not to do a recertification because then
    somebody's Medicaid was at stake, whereas before they could overlook it, you
    know, not do it.  They were supposed to do the recertifications . . . [b]ut some

new caseworker positions were added from mid-2004 to mid-2006; that after the automatic

closure policy was instituted, the amount of cases closed each month increased substantially; and

that the majority of the cases closed each month are subsequently reopened.[18]  From this evidence,

Plaintiffs would like the Court to infer that the majority of the Medicaid cases are closed each

month because recertifications are not processed timely by HSD caseworkers.[19]  *See, e.g.,*

Plaintiffs' Response to Defendants' Motion to Dismiss All Claims Against All Defendants, [Doc.

No. 165], at p. 8 ("Considering that the caseworkers already had very high caseloads, and that

there was a backlog of Medicaid recertifications before implementation of automatic closure, it is

simply not possible that all Medicaid recertifications are now miraculously processed on time.").

       To the extent that a nonmoving party relies on inference to defeat summary judgment

motion, it must be a reasonable inference.  *See, e.g., Parrillo v. Commercial Union Ins. Co.*, 85

---

            caseworkers just let the cases go on without determining the eligibility, and this
            forced them to do it.
Dep. Rita Espinosa at 66-67.

       [18]  Plaintiffs also submitted deposition testimony from Dr. Lynne Uhring discussing how
interruption in Medicaid benefits interferes with the provision of health care.  Dr. Uhring's
testimony regarding why some of her patient's Medicaid benefits were terminated, however, is
hearsay and will not be considered by the Court.   Federal Rule of Civil Procedure 56(e) mandates
that evidence offered in opposition to a motion for summary judgment be "made on personal
knowledge, shall set forth such facts as would be admissible in evidence, and shall show
affirmatively that the affiant is competent to testify to the matters stated therein."   Fed. R. Civ. P.
56(e).   Hearsay testimony cannot be considered because "[a] third party's description of [a
witness'] supposed testimony is not suitable grist for the summary judgment mill."   *Thomas v.
International Business Machines*, 48 F.3d 478, 485 (10th Cir. 1995) (citations omitted).  For the
same reason, the statements in Dr. Javier Aceves' affidavit regarding why some of his patients
have had their benefits terminated are inadmissable.

       [19]  Plaintiffs state that their material facts "will be proven by plaintiffs' witnesses at trial."
Response at p. 17.  When a summary judgment motion has been filed, however, Plaintiffs must
come forward with their admissible evidence in opposition to that motion.

F.3d 1245 (7th Cir. 1996) (in deciding a case on summary judgment, a court is not required to draw every possible inference in favor of nonmovant, only all reasonable inferences).  In determining whether the inference that a party seeks to draw is reasonable, the court may look to other evidence in the record that tends to make the inference more or less plausible.  *See Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1065 (Em. App. 1978) ("In determining whether a factual inference which a party seeks to draw is reasonable, the court may look to other evidence in the record which tends to make that inference more or less plausible."); *Cantrade Private Bank Lausanne Ltd. v. Torresy*, 876 F.Supp. 564, 568 (S.D.N.Y. 1995)(on motion for summary judgment, court draws all reasonable inferences in favor of nonmoving party only after determining that such inferences are reasonable, considering all evidence presented); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252-253 (2d Cir. 1987) (on summary judgment, "the Supreme Court has indicated that trial courts should draw only reasonable inferences in favor of the non-moving party viewing the evidence as a whole . . ..") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1357 (1986) and *International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 793-94 (2nd Cir. 1987)).

In contravention of Plaintiffs' proposed inference, HSD has submitted sworn affidavits from every HSD county director or manager who is responsible for the processing of Medicaid recertification applications expressly stating that they are unaware of any problems in the timely processing of Medicaid recertification applications in their respective offices.  While these are

form affidavits with limited factual basis provided for these statements, they are admissible,

uncontroverted evidence directly contradicting the inference Plaintiffs propose.[20]

 Defendants also submitted testimony from an HSD manager stating that caseworkers in

the office she supervises have not had any difficulty processing recertifications since

implementation of the automatic closure system;[21] testimony from an HSD manager explaining

that HSD accommodated the additional work created by shorter recertification periods by shifting

employees into the Medicaid bank;[22] and testimony from an HSD regional manager stating that

---

[20] Plaintiffs argue that the affidavits are not reliable because they are contrary to other testimony from defense witnesses. *See* Plaintiffs' Response to Defendants' Motion to Dismiss All Claims Against All Defendants, [Doc. No. 165], at pp. 8-10. First, the testimony Plaintiffs cite as being contrary to the affidavits was not provided to the Court. Consequently, Plaintiffs' unsupported allegations of contrary testimony are insufficient to controvert the affidavits. Second, this testimony, as described by Plaintiffs, is not contrary to the affidavits. Plaintiffs state that two regional managers testified that they have no mechanism in place to evaluate whether caseworkers are able to timely process Medicaid recertifications. The fact that regional managers have no mechanism in place to evaluate whether caseworkers are able to timely process Medicaid recertifications does not suggest that the office managers who are actually in charge of the processing of Medicaid recertifications do not know whether recertifications are timely processed in their offices.

[21] *See* Dep. Bertha Bustamonte at 116-117 (stating that there is no problem with the processing of  recertification applications in the office she supervises).

[22] *See* Dep. of Rita Espinosa at 66-67 (Q.  Did the automatic closure system affect your caseworkers' workloads?  A.  No.  Q.  Did it affect the way they did their jobs in any way?  A. Somewhat.  It encouraged them to do their jobs properly.  Q.  Explain why.  A.  Well, because they couldn't choose not to do a recertification because then somebody's Medicaid was at stake, whereas before they could overlook it, you know, not do it.  They were supposed to do the recertifications.  So you know, the proper way was to do the recertifications because we have to know if somebody continues to be eligible.  Otherwise, that can cause all kinds of problems.  But some caseworkers just let the cases go on without determining the eligibility, and this forced them to do it.  Q.  And given that increased pressure, where did they find the time to do it?  A. Basically we put more people into our Medicaid banks to start with, more because of the six-month recertification.  Obviously, if you have to recertify a case every six months, instead of every twelve months, that's more work.  And so we moved more people into the Medicaid bank. We also moved more kinds of cases into it.).

while there has not been any formal study regarding the reason for the increase in case closures,

HSD field offices have reported that the predominant reason for the closures is the failure of

Medicaid recipients to submit recertification information.[23]

In the face of  uncontroverted evidence that Medicaid recertifications are being timely

processed, Plaintiffs' proposed inference that the increase in case closures each month is due to

the failure of caseworkers to process recertifications is not reasonable and fails to support a

competing version of the truth that requires resolution by a factfinder at trial.[24]  *See, e.g., Fenner*

*v. General Motors Corp.*, 657 F.2d 647, 651 (5th Cir. 1981) ("An inference may be unreasonable

if it is 'at war with uncontradicted or unimpeached facts.'"); *Selle v. Gibb*, 567 F.Supp. 1173,

1182 (N.D.Ill. 1983)("Where the case of a plaintiff is based on an inference or inferences, it must

fail upon proof of undisputed facts inconsistent with such inference or inferences.").

---

[23]  *See* Dep. Kathryn Falls at 82. ("Q.  And are you aware if there has been any attempt to figure out why it is that so many cases that are autoclosed are subsequently reinstated?  A.  There has not been an official study.  I think that what I hear from my field offices is that people do not always bring in the notices--the information, not the notices, I'm sorry, and so sometimes people do not react until they get a notice saying that it's closed, and my understanding is that is the predominant reason for most of the closures, and, then, the reinstatements.").

[24]  While the Court is not choosing between two reasonable inferences, which would be a question for the trier of fact, it does note that other courts have held that if, in a nonjury case like this one, the basic dispute between the parties concerns factual inferences that one might draw from more basic facts to which the parties have drawn the court's attention, the court is freed from the usual constraints that attend adjudication of summary judgment motions and may engage in a certain amount of differential factfinding.  *See, e.g., Reich v. John Alden Life Ins. Co.*,126 F.3d 1 (1st Cir. 1997).  This question has not been addressed by the Tenth Circuit.  *See Skinner v. Administrative Committee of W.R. Grace & Co. Long Term Disability Income Plan*, 956 F.2d 278, *1 (10th Cir. 1992) (unpublished) ("Because we conclude that Plaintiff has failed to demonstrate a genuine issue of material fact, *see* Fed.R.Civ.P. 56, we find it unnecessary to address Defendant's argument that the district court may resolve issues of material fact on summary judgment where the case was set for a nonjury trial.").

While Plaintiffs are quick to point out that HSD does not keep statistics on why cases are closed, the fact that such statistics are not kept by HSD does not relieve Plaintiffs of the burden of proving their case. For example, in a similar case challenging the timeliness of the District of Columbia's processing of Medicaid applications, plaintiffs retained experts to review case files and gather data regarding the timeliness of the District's application processing. *See Salazar v. District of Columbia*, 954 F.Supp. at 284. Plaintiffs in this case have no such data.

As Plaintiffs themselves acknowledged, a decision "on whether the plaintiffs' injuries are a result of the ongoing auto-closure system or whether there has been a series of unfortunate 'clerical errors' will ultimately decide this case." Plaintiffs' Response to Defendants' Motion to Dismiss all Claims Against All Defendants, [Doc. No. 165], at 5-6. The undisputed evidence in the record demonstrates that the injuries suffered by Plaintiffs were, in fact, the result of clerical errors and not a result of the design or operation of the recertification system. Notably, Plaintiffs were only able to identify one person out of the thousands of Medicaid recipients who recertify each month whose Medicaid benefits lapsed because her caseworker failed to timely enter her recertification information into HSD's computer system.[25] In short, the evidence provided to the Court is insufficient to create genuine issues of material fact as to whether Plaintiffs' injuries were caused by HSD's recertification program rather than isolated human errors. As a result, Plaintiffs do not have standing to assert their claims for prospective relief because they have not

---

[25] Plaintiffs have provided an affidavit from Patricio Mejia, who relays the difficulty she had getting her family's Medicaid benefits recertified. According to the affidavit, Ms. Mejia timely submitted her recertification materials but her caseworker failed to enter the recertification information in a timely manner and her benefits were terminated. After three months and numerous phone calls, Ms. Mejia's family's Medicaid benefits were reinstated.

demonstrated that they have a "real and immediate threat of being injured in the future" by the recertification process.[26]

Plaintiffs have also failed to demonstrate any systemic failure in the notice part of the recertification process.  Plaintiffs assert that HSD's notice process is inadequate because HSD has "not adequately dealt with undeliverable mail problems, and they have not instituted a workable change of address system, and they do not adequately follow through to determine if clients were informed of the need to recertify."[27]  Response at p. 19-20.

While Plaintiff Valdez asserts that HSD failed to change her last name when requested, she does not allege that the failure to change her name resulted in any difficulty receiving her notices.  Thus, Plaintiff Valdez has failed to demonstrate any injury from the failure to change her name much less that there is a real and immediate threat of being similarly injured in the future.

Plaintiff Genthner claims that HSD failed to update its records when she submitted a change of address.  According to Plaintiff Genthner, the failure to change her address resulted in notices being sent to her former address, where she picked them up some weeks later. Plaintiffs have provided no evidence that HSD failed to update any other recipients' addresses.

---

[26]  Because the court has found that the named Plaintiffs lacked standing at the time their complaint was filed, the Court need not consider the claims of the purported class.  *See, e.g., O'Shea v. Littleton*, 414 U.S. at 494 ("if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendant, none may seek relief on behalf of himself or any other member of the class.").

[27]  The Court construes Plaintiffs' argument that HSD must follow through to determine if clients were informed of the need to recertify as part of their argument regarding *ex parte* reviews that was considered, and rejected, above.  Plaintiffs also make a number of other allegations regarding deficiencies that exist in the notices, including whether the notices are translated into Spanish, Vietnamese, and Navajo.  Not only are these alleged deficiencies unsupported by evidence, but there is also no evidence that there is "a real and immediate threat" that Plaintiffs will be injured by these alleged deficiencies in the future.

Consequently, even assuming that failure to update Plaintiff Genthner's address resulted in an injury to Plaintiff Genthner, the fact that HSD failed to update one recipient's address does not suggest that there is a reasonable likelihood that such an error will occur in the future.

At most, Plaintiff Genthner has demonstrated that occasional human errors occur in updating Medicaid recipient's addresses. She has not, however, demonstrated that HSD has a systemic problem updating recipient's addresses. Thus, HSD's failure to update Plaintiff Genthner's address does not provide Plaintiff Genthner with standing to seek injunctive and declaratory relief regarding HSD's recertification system.

Finally, Plaintiffs assert that HSD's notice system is deficient because Medicaid recipients who provide undeliverable addresses to HSD do not receive their notices. During discovery in this case Plaintiffs learned that the post office does not deliver mail if the name on the post office box does not match the name of the addressee. Thus, if Medicaid recipients provide a post office box address to HSD for which they are not the boxholder, they may not receive their notices. While HSD has affirmatively tried to educate clients about post office rules regarding the use of post office boxes, the fact that recipients provide invalid addresses is not a problem with HSD's notice process. There is simply no connection between the post office's delivery policies and the recertification process such that enjoining the recertification process would resolve postal delivery problems. *See Lujan*, 504 U.S. at 560 (to invoke federal jurisdiction, a plaintiff must show that his or her injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court") (quotation omitted).

Furthermore, neither Plaintiffs allege that they use a post office box or that they have had any problem with the post office refusing to deliver their notices. Thus, it is impossible for

Plaintiffs to demonstrate that there is a real and immediate threat that they will be injured by the delivery policies of the post office in the future.

In conclusion, Plaintiffs have failed to demonstrate that as of the date their complaint was filed, they faced a real and immediate threat of being injured in the future by the Medicaid recertification process.  Consequently, Plaintiffs lack standing to bring a challenge to the recertification system and their claims must be dismissed for lack of jurisdiction.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss and/or Motion for Summary Judgment as to All Claims Against All Defendants, filed on July 17, 2006, **[Doc. No. 167]** is **GRANTED**.  Plaintiffs' Complaint is hereby dismissed in its entirety.

Dated this  29th day of September, 2006.

_____
MARTHA VAZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorneys  for Plaintiff:
        Gail Evans, Esq.
        John Bouman, Esq.

Attorneys for Defendants:
        Susan K. Rehr, Esq.
        Paul R. Ritzma, Esq.